# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

    v.

**DAVID SPARKS, JR.,**

    **Defendant.**

Case No. 1:24-cr-85

JUDGE DOUGLAS R. COLE

## OPINION AND ORDER

Defendant David Sparks, Jr., asks the Court for two separate forms of relief in this criminal matter. First, he moves the Court to dismiss Count Three of the Indictment against him. (Doc. 18). Second, he urges the Court to suppress certain evidence that the government intends to introduce at trial. (Doc. 19). For the reasons discussed below, the Court **DENIES** both motions.

## BACKGROUND

In the early evening of May 22, 2024, undercover Officers Grant Perry and Jeremy Chitwood were sitting in an unmarked police car near 1636 Summit Road conducting an investigation unrelated to Sparks. (Mot. to Suppress Hr'g Tr., Doc. 22, #63–65, 81–83, 129). They first noticed Sparks when he approached their vehicle from the rear. (*Id.* at #64–65, 83). At the time, their car was parked alongside the right-hand curb on Summit Road facing east toward Reading Road. (*Id.* at #64–66). Sparks—who was walking east on Summit Road in the roadway—passed by the officers' driver's side door (i.e., on the traffic side of the car). (*Id.*). He then turned left and began walking across the street at a forty-five-degree angle until he reached the

opposite side of Summit Road. (*Id.* at #66, 83, 96). After walking along the north side of Summit Road for a few yards, Sparks turned north onto Newbedford Avenue, a street that dead-ends on its south end at Summit Road. (*See id.* at #66, 83–84).

Sparks' crossing of Summit Road, the officers say, amounted to jaywalking in violation of Cincinnati City Code § 506-46. (*Id.* at #66, 83). Moreover, as Sparks passed their vehicle, Perry and Chitwood also observed a firearm in his pocket. (*Id.* at #65, 83). At that point, given the jaywalking and the visible firearm, Perry and Chitwood radioed for a uniformed officer in a marked vehicle to come to the scene, stop Sparks, and investigate further. (*Id.* at #65–66, 83).

Uniformed Officer Corey Bender responded to Perry and Chitwoods' call. (*Id.* at #105–06). Bender first encountered Sparks a short distance up Newbedford Avenue. (*Id.* at #106). Officer Bender's and the other two officers' body cameras capture the events from that point on. As Bender arrived, Sparks was turning to walk across the front yard to the porch of a home located at 7727 Newbedford Avenue. As Sparks began climbing the steps to the home's front door, Bender yelled, "Hey, what's up, man? Come here." (*See id.* at #106–07). Sparks looked back at Bender momentarily but then ignored the officer and continued walking up the steps. (*Id.* at #107). Bender followed, pulling his taser. (*See id.* at #108). He instructed Sparks to put his hands up. (*Id.*). Sparks complied. (*Id.*).

At the same time Bender was giving Sparks instructions, Perry and Chitwood—who had followed Sparks onto Newbedford Avenue—arrived on the scene. (*Id.* at #67–68, 84, 108). When Perry reached Sparks and Bender, Sparks was

2

standing on the front porch nearly at the front door. (*Id.* at #68). Perry, believing that Sparks was not complying with Bender's orders, also pulled his taser and yelled at Sparks to get on the ground. (*Id.*).

Rather than doing so, Sparks spun toward the front door and placed his hand on the handle. (*Id.* at #68, 109–110). At that point, Bender and Perry both tased Sparks. (*Id.*).

Once immobilized, Bender placed Sparks in handcuffs. (*Id.* at #110). The other officers searched Sparks' person. (*Id.*). They seized the firearm they had observed while on Summit Road, along with crack cocaine, marijuana, a digital scale, and money from Sparks' pockets. (Doc. 19, #41). Bender then took Sparks into custody. (Doc. 22, #111).

Police initially held Sparks at the Hamilton County Justice Center on state charges related to the firearms and narcotics. (Doc. 19, #41). But while those charges were pending, federal prosecutors adopted the case. (*Id.*).

On August 7, 2024, a federal grand jury indicted Sparks on four charges: (1) possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(C); (2) possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A); (3) possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2); and (4) possession of a firearm in a school zone in violation of 18 U.S.C. § 922(q)(2) and § 924(a)(4). (Indictment, Doc. 1, #1–2).

Sparks has since filed two motions. First, he moves to dismiss Count Three of the Indictment, asserting that § 922(g)(1) is unconstitutional under the Second Amendment as applied to him. (Doc. 18). Second, he moves to suppress two categories of evidence. (Doc. 19). He first seeks to suppress the physical evidence taken from his person after the officers tased and handcuffed him, as the arrest (and thus the subsequent search) allegedly violated his Fourth Amendment rights. (*Id.* at #42–43). Separately, he asks the Court to suppress statements he made to the officers before they advised him of his *Miranda* rights, arguing that the use of those statements would violate his Fifth Amendment rights. (*Id.* at #43–44).

The Court held an evidentiary hearing on November 20, 2024. (*See* 11/20/24 Min. Entry). Officer Perry, Officer Chitwood, Officer Bender, and Kara Killen (an investigator for the Office of the Federal Public Defender) all testified at that hearing.

The parties have since filed post-hearing briefs. (Post-Hearing Br., Doc. 25; Resp., Doc. 27; Reply, Doc. 28). So the motions are now ripe for review.

## LAW AND ANALYSIS

**A. The Court Denies Sparks' Motion to Dismiss Count Three of the Indictment.[1]**

Sparks argues that § 922(g)(1)'s prohibition on possessing a firearm is unconstitutional as applied to him because it violates his Second Amendment rights. That argument fails given Sparks' criminal history.

---

[1] At the evidentiary hearing, Sparks hinted that he moved to dismiss Count Three of the Indictment primarily to preserve the issue for appeal should Supreme Court precedent regarding felon disarmament disrupt the Sixth Circuit's current approach under *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024). (*See* Doc. 22, #159–61).

4

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court held in *District of Columbia v. Heller* that this Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." 554 U.S. 570, 592 (2008). So individuals can keep weapons in "common use," like handguns, for "lawful purposes." *Id.* at 624–25, 627 (citation omitted).

But that only goes so far. *Heller* clarified that the Second Amendment does not guarantee a right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. Moreover, the Supreme Court specifically noted that "longstanding prohibitions on the possession of firearms by felons" are "presumptively lawful." *Id.* at 626–27, 627 n.26.

Faced with those admonitions, lower courts struggled to decipher the exact contours of the individual right. So, in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court clarified the framework courts should apply to Second Amendment challenges. After *Heller* but before *Bruen*, courts relied on a two-step framework, one that combined historical analysis with means-end scrutiny. *Id.* at 17. *Bruen*, however, did away with that two-step. *Id.* Instead, to justify a firearm regulation "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

Then, two years later, in *United States v. Rahimi*, 602 U.S. 680 (2024), the Supreme Court further clarified *Bruen*'s history-and-tradition test. Under *Rahimi*, to

5

pass constitutional muster, a new firearm regulation must be "relevantly similar" to a historical analogue and "consistent with the principles that underpin our regulatory tradition." *Id.* at 692 (citations omitted). And, as "relevantly similar" and "consistent" suggest, the historical analogue "need not be a 'dead ringer' or a 'historical twin'" to suffice. *Id.* (citation omitted).

Against that backdrop, the Sixth Circuit recently reevaluated circuit precedent regarding § 922(g)(1)'s constitutionality. *See generally United States v. Williams*, 113 F.4th 637 (6th Cir. 2024). In *Williams*, the Sixth Circuit first confirmed that the Second Amendment's text extends to a felon's possession of a firearm; in other words, a felon is "a member of the people claiming 'the right' to possess a gun—to 'keep and bear arms.'" *Id.* at 649–50. Given that conclusion, it next considered whether § 922(g)(1)—the felon disarmament statute—is consistent with the nation's historical tradition of firearm regulation. *Id.* After an exhaustive historical analysis, the Sixth Circuit determined that, consistent with historical tradition, legislatures may disarm *dangerous* felons, but only so long as the felon "has an opportunity to make an individualized showing that he himself is not actually dangerous." *Id.* at 663.

Beyond that, the Sixth Circuit also offered insights to guide district courts in evaluating future constitutional challenges to § 922(g)(1). *Williams* first took facial challenges to § 922(g)(1) off the table. *Id.* at 657 ("Because … most applications of § 922(g)(1) are constitutional, the provision is not susceptible to a facial challenge."). But *Williams* left the door open for felons to mount as-applied challenges. *Id.* In those cases, the district court is tasked with making the dangerousness determination—

6

that is, whether the felon "has met his burden to demonstrate that he is not dangerous," thus falling outside § 922(g)(1)'s historically informed ambit. *Id.*

Helpfully, the Sixth Circuit also outlined three categories of crimes that weigh on the dangerousness determination. The first category consists of "crimes against the person," which includes things like murder, rape, assault, and robbery. *Id.* at 658. These types of violent crimes provide "strong evidence" of a felon's dangerousness. *Id.* The second category of crimes are those that "pose a significant threat of danger" even if they do not "involve an immediate and direct threat of violence against a particular person," such as burglary and drug trafficking. *Id.* at 659. The final category includes crimes that "cause no physical harm to another person or the community" but are nonetheless felonies like, for example, mail fraud. *Id.*

*Williams* also clarified that the dangerousness determination is "fact-specific" and depends on the individual defendant's "unique circumstances." *Id.* at 660. So district courts need not find "categorical matches" of dangerousness. *Id.* (cleaned up). Rather, they must make "informed judgments about how criminals commonly operate" in connection with various crimes. *Id.* (cleaned up). Also, "a court may consider a defendant's entire criminal record" when making the dangerousness determination; it is not limited to considering only the "specific felony underlying [a defendant's] § 922(g)(1) conviction." *Id.* at 659–60. And a district court can make its determination on the record alone without holding an evidentiary hearing. *Id.* at 662. At day's end, though, "in an as-applied challenge to § 922(g)(1), the burden rests on [the defendant] to show he's not dangerous." *Id.*

7

With that legal framework in mind, the Court turns to Sparks' as-applied challenge to § 922(g)(1). His sole argument is that he is not dangerous because none of his prior convictions meet *Williams*' definition of dangerousness. (Doc. 18, #38). The Court disagrees.

Indeed, while there may be close cases, this is not one of them. Sparks has previously pleaded guilty to voluntary *manslaughter* and two counts of felonious assault. (Pretrial Service Report, Doc. 12, #24). Not surprisingly, the Sixth Circuit has said that such crimes are "highly probative" of dangerousness. *See, e.g.*, *United States v. Vaughn*, No. 23-5790, 2024 WL 4615853, at *2 (6th Cir. Oct. 30, 2024) (finding that a crime like aggravated robbery exhibits dangerousness); *see also United States v. Morton*, 123 F.4th 492, 499 (6th Cir. 2024) (explaining that the defendant's previous convictions for wanton endangerment and "assault resulting from a domestic-violence incident" demonstrate dangerousness). The Court agrees. Indeed, both crimes—manslaughter and felonious assault—fall within *Williams*' first category, which again, is "strong evidence" of dangerousness, if not dispositive of it. *Williams*, 113 F.4th at 658. In short, people convicted of voluntary manslaughter and felonious assault constitute "dangerous individuals" for Second Amendment purposes. Sparks has failed to meet his burden in persuading the Court otherwise. So the Court concludes that § 922(g)(1) is constitutional as applied to Sparks and therefore **DENIES** his motion to dismiss Count Three.

8

**B.      The Court Denies Sparks' Motion to Suppress Evidence.**

Separately, Sparks seeks to suppress two categories of evidence on Fourth and Fifth Amendment grounds, respectively: (1) the physical evidence that officers seized from his pockets after they handcuffed him; and (2) the incriminating statements he made before the officers advised him of his *Miranda* rights. (Doc. 19, #42–44). But the Court need only address the former. That is because the government, which concedes that officers questioned Sparks before administering *Miranda* warnings, stipulates that it will not use Sparks' statements in its case-in-chief. (Doc. 21, #52).

With that out of the way, the Court turns to Sparks' Fourth Amendment argument. Sparks offers three reasons why the Court should suppress the seized evidence. First, he claims that the officers acted unreasonably by using a taser to investigate jaywalking, therefore invalidating the stop and subsequent search. (Doc. 25, #171–74). Second, Sparks argues that the officers failed to disclose the reason for the stop before they tased him, which means they (not Sparks) manufactured the circumstances that led Sparks to allegedly obstruct their official business. (*Id.* at #174–76). Third, and finally, Sparks says that without video evidence, the Court cannot conclude that he in fact jaywalked. (*Id.* at #176–77; *see also* Doc. 19, #43). And without that underlying violation, the officers had no basis to stop him. (*See* Doc. 25, #176–77).

The government, unsurprisingly, disagrees. It claims that the officers validly stopped Sparks to investigate the alleged jaywalking. (Doc. 27, #184). And then, when Sparks resisted the officers' commands and attempted to flee into the house, those

9

actions escalated the situation, giving the officers probable cause to both arrest Sparks (which here included tasing) and search him. (*Id.* at #184–95).

The government has the better argument. As explained more fully below, the Court finds that Sparks jaywalked in the officers' presence, which provided a valid reason to conduct a *Terry* stop (even though, as they concede, it was the gun, rather than the jaywalking, that actually motivated the stop). And once they stopped him, the Court agrees that Sparks' conduct escalated the situation to the point that the officers had a legitimate basis to formally arrest and search him.

### 1. The Officers Engaged in a Valid *Terry* Stop.

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. To protect this right, courts suppress "evidence obtained in violation of the Fourth Amendment" and disallow its use "in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974). In most cases, Fourth Amendment rights are "preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer." *California v. Carney*, 471 U.S. 386, 390 (1985). But various exceptions exist that can make a search "reasonable," and thus permissible under the Fourth Amendment, even without a warrant.

One such exception is the *Terry* stop. It arises when an officer stops someone after "observ[ing] unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). An officer must have "reasonable suspicion" to lawfully engage in a *Terry* stop.

10

*United States v. Moberly*, 861 F. App'x 27, 29 (6th Cir. 2021). "Reasonable suspicion requires 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the continued detention." *Id.* (quoting *Terry*, 392 U.S. at 21)). And whether an officer has reasonable suspicion is based on the "totality of the circumstances," which includes "all the information and experience available to the police officer at the time of the stop." *United States v. Abdi*, 827 F. App'x 499, 504 (6th Cir. 2020).

The Court concludes that the officers had reasonable suspicion to conduct a *Terry* stop. At the evidentiary hearing, Chitwood testified that he observed Sparks walking down the middle of Summit Road. (Doc. 22, #83). And Perry testified that he observed Sparks cross the street at a forty-five-degree angle. (*Id.* at #66). Since functioning sidewalks lined both sides of Summit Street, (*id.* at #65), Sparks' conduct constituted jaywalking. Cincinnati Mun. Code §§ 506-46 ("No pedestrian shall cross a roadway at any place other than by a route at right angles to the curb or by the shortest route to the opposite curb except in a crosswalk."), 506-47 ("Where usable walks or paths parallel a roadway, no pedestrian shall walk in, along, or upon the roadway."). True, when there is no crosswalk within 150 feet of a desired crossing location, pedestrians may cross a roadway outside a crosswalk. Cincinnati Mun. Code § 506-46. And here Killen testified that there were no crosswalks within 150 feet of 1636 Summit Road—the address the officers cited in Sparks' jaywalking ticket. (Doc. 22, #133, 139 (explaining that the closest crosswalks were 495 feet and 693 feet away)). So the mere fact that Sparks *crossed* Summit Road outside of a crosswalk

11

would not necessarily amount to jaywalking. But even so, the *way* he crossed the road constituted jaywalking—i.e., walking down the roadway (instead of on the sidewalks) and then crossing at a forty-five-degree angle (rather than a ninety-degree angle). *See* Cincinnati Mun. Code §§ 506-46, 506-47. And given that jaywalking is a misdemeanor offense, *id.* § 512-1, under *Terry*, the officers could validly stop Sparks to issue a citation. *See State v. Moorer*, 23 N.E.3d 173, 177–78 (Ohio Ct. App. 2014).

But that's not quite the whole story. That Perry and Chitwood (the officers who observed the jaywalking) could validly stop Sparks to investigate does not necessarily mean Bender (who did not observe the jaywalking) could later stop Sparks to investigate the then-completed misdemeanor. As the Sixth Circuit has explained, whether an officer can conduct a *Terry* stop to investigate an already-completed misdemeanor "turns on the nature of the crime, how long ago the suspect committed it, and the ongoing risk of the individual to the public safety." *United States v. Jones*, 953 F.3d 433, 437 (6th Cir. 2020).

Having considered those factors, the Court is satisfied that Bender stopping Sparks just minutes after the jaywalking occurred did not run afoul of the Fourth Amendment. True, jaywalking is a relatively minor offense. But the stop was nearly contemporaneous with the activity that gave rise to it. Bender arrived on the scene within a couple of minutes and did so precisely because Perry and Chitwood radioed for uniformed backup. Presumably, the only reason that Perry and Chitwood did not undertake the stop themselves was because they did not want to break cover in connection with their other investigation (although when things escalated, they did).

So the temporal proximity between the jaywalking and the stop alone suggests that the stop was reasonable.

Nor does it matter that the jaywalking was not the "real" reason for the stop. On the stand, the officers freely admitted that what motivated the stop was the desire to further investigate why Sparks was carrying a firearm. (Doc. 22, #77). But the Supreme Court has said that, so long as conduct warranting the stop exists, it matters not a whit whether that conduct was the actual motivation for the stop. *Whren v. United States*, 517 U.S. 806, 813 (1996). Just so here. The jaywalking authorized a brief *Terry* stop, whatever the true motivation for that stop may have been.

Sparks resists that conclusion on two grounds. First, he claims that deploying a taser exceeds what is reasonable to investigate jaywalking. (Doc. 25, #171). To Sparks' credit, he correctly articulates the standard: a *Terry* stop must "last no longer than is necessary" and the officers must use the "least intrusive means reasonably available" to confirm or dispel their suspicions. *Florida v. Royer*, 460 U.S. 491, 500 (1983). But on the facts here his reasoning fails to persuade. For one, the government does not suggest that tasing Sparks was a reasonable method to investigate *jaywalking*. Rather, it argues that once Sparks disobeyed the officers' commands and tried to flee, that gave them probable cause to tase and formally arrest Sparks for *obstructing their official business* (more on that later). (Doc. 27, #184–85).

For another, the Court is not convinced the officers' conduct was unreasonable. Video evidence from the suppression hearing depicted the following: Bender arrived at 7727 Newbedford Avenue and yelled at Sparks, "Hey, what's up, man? Come here."

13

Sparks, who was climbing steps en route to the house, looked back at Bender, then continued up the stairs. Bender, mindful that Sparks likely possessed a firearm and unsure whether Sparks resided at the house he was approaching, (Doc. 22, #109), followed Sparks, pulled his taser, and told Sparks to stop and put his hands up. Perry, who observed Sparks ignore Bender's initial order and who also knew that Sparks possessed a firearm, ran to join Bender with his own taser drawn. Sparks stopped and put his hands up for a moment, but then, when Perry told him to get on the ground, Sparks turned and lurched for the door. All that happened within seconds.

Given Sparks' noncompliance out of the gate and the added concern that he possessed a firearm, the Court cannot agree the officers' actions were unreasonable. Sparks would not stop to allow them to "verify or dispel [their] suspicion[s]"—the very point of a *Terry* stop. *Royer*, 460 U.S. at 500. True, Bender could have perhaps announced the reason for the stop: Sparks' jaywalking. But "to be reasonable is not to be perfect." *United States v. Marsh*, 95 F.4th 464, 468 (6th Cir. 2024) (cleaned up). Indeed, the Fourth Amendment offers officers "fair leeway for enforcing the law in the community's protection." *Id.* (quotation omitted). The Court, moreover, is aware of no caselaw (and Sparks cites none) that requires an officer to announce the reason for a *Terry* stop to make that stop reasonable. So, in light of Sparks' unwillingness to follow lawful directions and the short time period during which the stop-turned-arrest developed, the officers' conduct in connection with the *Terry* stop did not rise to a level of unreasonableness.

Sparks next complains that because no video evidence captures Sparks jaywalking the Court cannot determine with certainty whether he in fact did so. (Doc. 25, #176–77). But video evidence is not a prerequisite to establishing probable cause. To the contrary, the Court finds Perry's and Chitwood's testimonies concerning Sparks' jaywalking credible. Both testified that Sparks walked in Summit Street rather than using the available sidewalks. (*Compare* Doc. 22, #65–66 *with id.* at #83, 95–96). Perry added that Sparks crossed the street a forty-five-degree angle. (*Id.* at #66). The Court is thus satisfied that the officers had reasonable suspicion to stop and cite Sparks for a pedestrian violation.

2. **The Officers Had Probable Cause to Arrest and Search Sparks.**

The Court's inquiry, however, doesn't end with the legality of the *Terry* stop. The officers tased, arrested, and searched Sparks. That is, admittedly, more than a *Terry* stop allows. In other words, what began as a brief investigatory stop evolved into an arrest and subsequent search. So the government must separately justify Sparks' arrest, which requires probable cause to be lawful. *Smith v. City of Wyoming*, 821 F.3d 697, 714–15 (6th Cir. 2016), *as amended* (May 18, 2016). Probable cause, which is also based on the totality of the circumstances, exists "where the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person in believing that the suspect committed, is committing, or is about to commit an offense." *Id.* (cleaned up).

Minor misdemeanors such as jaywalking do not give rise to the power to arrest. *See, e.g.*, *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 492 n.2 (6th Cir. 2012)

15

("Jaywalking is a minor misdemeanor, which does not normally justify custodial arrest."). And to its credit, the government does not rely on the jaywalking to justify the arrest here. Rather, as noted, the government argues that once Sparks ignored the officers' commands, turned and reached for the front door's handle, and attempted to enter the house, they had probable cause to believe he was committing a *different* crime—obstructing the officers in the performance of their duty in violation of Ohio Revised Code § 2921.31. (Doc. 21, #54; Doc. 27, #184–85). And that crime would allow them to formally arrest Sparks because obstructing official business is, at the very least, a second-degree misdemeanor that permits arrest. (*Id.*).

To establish a violation of § 2921.31, five things must exist: "(1) an act by the defendant; (2) done with the purpose to prevent, obstruct, or delay a public official; (3) that actually hampers or impedes a public official; (4) while the official is acting in the performance of a lawful duty; and (5) the defendant so acts without a privilege to do so." *State v. Henry*, 110 N.E.3d 103, 116 (Ohio Ct. App. 2018) (quotation omitted). And importantly, Ohio courts emphasize that the first element requires "proof of an affirmative act" that impedes police conduct. *See, e.g.*, *id.*

Based on those factors, the Court concludes that the officers had probable cause to conclude that Sparks was obstructing official business, and thus to arrest him. First, video evidence at the suppression hearing showed that Sparks—after ignoring Bender's initial command to stop and then Perry's command to get on the ground—attempted to flee into the house by deliberately turning toward the front door and placing his hand on the handle. That's an affirmative act. *See, e.g.*, *State v.*

*Friedman*, 2013-Ohio-4669, ¶ 23 (5th Dist.) (explaining that the defendant "walking away from [the officer] was an affirmative act"); *State v. Davis*, 749 N.E.2d 322, 323–24 (Ohio Ct. App. 2000) (noting that the defendant's refusal to stop walking away from the officers gave them probable cause to believe he was impeding the performance of their duty).[2] Perry's and Bender's testimonies affirm that they reasonably understood Sparks' reaching for the door as an attempt to flee. (Doc. 22, #77–78, 108–10). Second, Sparks purposely reaching for the door handle at least suggests he intended to prevent the officers from speaking with him. Third, Sparks' refusal to stop or get onto the ground hampered the officers' ability to ask him investigatory questions or otherwise cite him for jaywalking. Fourth, during the encounter, the officers were performing their lawful surveillance and patrolling duties. Fifth and finally, Sparks has presented no evidence that he acted with privilege when he tried to escape his encounter with the officers. Taken together, the Court finds that the officers had probable cause to arrest Sparks for obstructing official business. *See State v. Lenzy*, 2018-Ohio-3485, ¶¶ 22–28 (5th Dist.).

To round out the analysis, the Court further concludes that the officers lawfully searched Sparks after arresting him. After all, officers can search an arrestee's person

---

[2] Sparks argues that the cases the government cites—e.g., *Friedman* and *Davis*—are "inapposite" because they address flight and Sparks "did not run." (Doc. 28, #191). But the Court fails to see how that renders those cases inapplicable. First, Sparks did walk away from Bender after Bender told him to "come here." Second, and perhaps more importantly, those cases stand for the proposition that taking an action in contravention of an officer's command, such as Sparks' action of reaching for the door after Perry told him to get on the ground, counts as an "affirmative act" for purposes of the § 2921.31 analysis.

17

incident to a lawful custodial arrest. *United States v. Robinson*, 414 U.S. 218, 235 (1973).

Sparks counters with an analogy to the "police-created exigency" doctrine. He says that the officers created the circumstances that allegedly obstructed their official duties by failing to disclose the reason for the stop. (Doc. 25, #174–76). In other words, Sparks seems to argue that because the officers "pointed their tasers" and "barked orders" at him without explaining why they were there, they duped him into "attempt[ing] to remove himself from the … scary[] situation" by reaching for the door, which they then claimed was an obstruction of their duties. (*Id.* at #174–75).

The Court is not persuaded. The video evidence showed Sparks walking away from Bender after Bender first asked Sparks to "come here"—well before any officer pulled a taser.[3] Bender's testimony confirms the same. (Doc. 22, #107 ("[W]hen I initially said, hey, come here, [Sparks] looked at me and he continued walking up the stairs towards the front of the residence.")). Bender, moreover, noted that he pulled his taser because of Sparks' initial noncompliance, and because he knew Sparks was likely armed and headed toward a house in which Sparks may or may not have lived.

---

[3] Sparks argues that he did nothing wrong—i.e., that he did not obstruct the officers' conduct—when he disregarded Bender's command to "come here" and instead continued up the stairs. (Doc. 28, #191–92). And Sparks hints that's because a *Terry* stop had not yet developed. (*See id.* (noting that, at the time Bender first yelled at Sparks, "Sparks may not have known he was being stopped")). In other words, Sparks seems to say that because, in his view, the officers lacked reasonable suspicion or probable cause to stop him, he had "the right to … go about his business." (*Id.*). Admittedly, the parties' briefing is less than clear about when they believe the officers had seized Sparks in *Terry*-stop fashion and when that *Terry* stop progressed to a full-blown arrest. Regardless, Sparks' problem is that Bender *did* have reasonable suspicion to stop and cite him for jaywalking, as already explained. So whether the government "concedes" that Sparks' initial failure to stop was not obstructive behavior (as Sparks suggests, (*id.*)), or not, is of no moment. Bender properly attempted to stop Sparks to cite him, Sparks did not comply, and the situation escalated from there.

18

(*Id.* at #109). Beyond that, Perry testified that he pulled his taser precisely because Sparks "wasn't listening to Officer Bender's demands." (*Id.* at #68). All told, then, the Court is not convinced that the officers manufactured the circumstances that led to Sparks obstructing the officers' duties.

For all these reasons, the Court **DENIES** Sparks' motion to suppress.

## CONCLUSION

For the reasons discussed, the Court **DENIES** Sparks' Motion to Dismiss Count Three of the Indictment (Doc. 18), and **DENIES** Sparks' Motion to Suppress Evidence (Doc. 19).

**SO ORDERED.**

April 9, 2025
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**